**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **ST. PAUL'S EPISCOPAL SCHOOL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CIVIL ACTION 18-0241-WS-B** |
| | ) |
| **THE ALABAMA HIGH SCHOOL** | ) |
| **ATHLETIC ASSOCIATION,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on plaintiff's Motion for Preliminary Injunction (doc. 2). The Motion, which has been the subject of extensive briefing on an expedited basis, is now ripe for disposition.[1]

**I. Overview of Decision.**

Last November, the Alabama High School Athletic Association adopted a "competitive balance factor" rule to increase by one level the classification of certain private-school members' sports teams with a demonstrated track record of consistent, recent success. St. Paul's Episcopal

---

[1] In its discretion, the Court takes the Motion under submission without a hearing. Circuit precedent provides that "[a]n evidentiary hearing is required for entry of a preliminary injunction only where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (citations and internal quotation marks omitted). Thus, in a case where there is "little dispute as to raw facts," but much dispute as to the inferences to be drawn from same, "the balancing between speed and practicality versus accuracy and fairness [is left] to the sound discretion of the district court." *Id.* (citation omitted). In the briefing schedule for St. Paul's Motion, this Court cited that legal standard and directed that "the parties' written submissions should highlight with specificity any circumstances that they contend necessitate a hearing." (Doc. 14, at 2.) Neither side has maintained that a hearing is reasonably necessary under the applicable test. Indeed, for its part, plaintiff filed a "Statement Concerning Hearing," setting forth its position that "it has met the burden to obtain relief …, but the school stands ready to answer any questions the Court may have." (Doc. 30, at 1.) The parties not having shown that a hearing is needed in this case, none will be held.

School stands to be directly affected by this rule in the 2018-2020 classification period with respect to several of its athletic programs, including most notably its football team, which will "level up" from 5A to 6A. After its attempts to persuade the Association to vacate or suspend the rule at two board hearings earlier this year were unsuccessful, St. Paul's filed this civil action against the Association and its Executive Director. The Complaint alleges that the Association violated St. Paul's constitutional rights in three respects (equal protection, substantive due process, procedural due process) and also breached certain obligations and duties in its Constitution, Bylaws and Handbook.

Contemporaneously with the Complaint, St. Paul's filed a Motion for Preliminary Injunction, seeking an order preliminarily restraining and enjoining the Association from enforcing this new competitive balance rule. Given the time-sensitive nature of the relief requested, the parties briefed the matter on an expedited basis. Counsel for both sides are to be commended for preparing comprehensive, well-written, helpful memoranda addressing complex constitutional and factual issues under extraordinary temporal pressure. Regardless of the Court's ultimate determinations about the merits of the theories and arguments presented, the quality of lawyering has been uniformly excellent. The Court's analysis and understanding has benefited greatly from counsel's diligent and thoughtful advocacy.

Upon careful consideration of the parties' arguments and exhibits, the Court concludes that preliminary injunctive relief is not appropriate at this time. A preliminary injunction is an extraordinary and drastic remedy, for which a movant bears a heavy burden of persuasion. In this case, St. Paul's has failed to demonstrate a substantial likelihood of success on the merits. With respect to the equal protection claim, St. Paul's has made an insufficient showing that the Association was motivated by "bare animus" against private schools; therefore, the challenged classification must be evaluated using deferential rational-basis review. Under this standard, the competitive balance rule is presumed constitutional, and must be upheld if any reasonably conceivable set of facts could provide a rational basis for it, even if the rule seems unwise and even though it works to a particular group's disadvantage. The AHSAA has a legitimate interest in promoting competitive balance for its members. The challenged rule could rationally be viewed as furthering that legitimate interest. Indeed, the requisite rational basis may be found in data reflecting private schools' disproportionate and ever-growing success in winning state championships, as well as in the numerous perceived advantages enjoyed by private schools

relative to public schools. St. Paul's has not shown a substantial likelihood that it can negate every one of those rational grounds for adoption of the competitive balance rule.

As for plaintiff's substantive due process claim, no substantial likelihood of success has been shown. The property rights identified by St. Paul's are shaky, at best. The proper standard of review for this claim is the same deferential rational-basis test utilized in the equal protection context, so St. Paul's can be no more successful on a substantive due process theory than it can on equal protection. St. Paul's attempt to seek heightened review on the grounds that the Association acted with "deliberate indifference to an extremely great risk of serious injury" cannot succeed (even assuming the legitimacy of that formulation of the standard in this Circuit) because the record does not support a finding that the Association callously, recklessly adopted this rule without heed of dire safety consequences. Next, plaintiff's procedural due process claim fails to provide a sufficient basis for preliminary injunctive relief because the record strongly suggests that the Association provided St. Paul's with ample and constitutionally adequate procedural safeguards, including allowing it to appear before the board twice to make its case against the competitive balance rule before it went into effect. Finally, no preliminary injunctive relief is warranted on St. Paul's state-law declaratory judgment claim because the various "duties" and "obligations" that plaintiff ascribes to the Association either appear not to be required by any contract or mutually explicit understanding, or do not appear to have been breached by passage of the competitive balance rule.

Today's ruling is in many ways a reflection of the daunting hurdle that a plaintiff in St. Paul's position must overcome in order to obtain preliminary injunctive relief. It is not the role of this Court to decide whether the competitive balance rule is the wisest, fairest, best or most efficient way of advancing the objective of promoting competitive balance in interscholastic athletics. Whether the Court thinks it is a good rule or a bad rule is irrelevant. This Court may not substitute its judgment for that of the Association. Moreover, the Alabama Supreme Court has repeatedly emphasized the AHSAA's near-absolute authority in its own affairs. A courtroom is rarely the proper field for competition when it comes to disputes over high-school athletic rules. Alabama courts take a hands-off approach to controversies concerning regulation of high-school athletics, at least in the absence of clear and convincing evidence of fraud, collusion, bias or arbitrariness. It does not appear substantially likely that any of those factors are present here. For these reasons, the Court finds that St. Paul's has not shown a substantial likelihood that the

competitive balance rule is unconstitutional, or that it violates the terms of the Association's Constitution, Bylaws and Handbook.  The Motion for Preliminary Injunction is properly denied.

## II.    Background Facts.

### A.    *The Parties' Relationship and History.*

The Alabama High School Athletic Association ("AHSAA") is a voluntary association comprising public, private and parochial schools in the State of Alabama.  (Savarese Decl. (doc. 24, Exh. B), ¶ 2.)  The stated purpose of the AHSAA, which was founded in 1921, is to regulate, coordinate and promote its member schools' interscholastic athletic programs.  (*Id.*)  At present, the AHSAA's membership includes 373 public schools and 51 non-public schools, such that non-public schools constitute 13.6% of the Association's total membership.  (*Id.*, ¶ 5.)  Among those members is plaintiff, St. Paul's Episcopal School, a private school located in Mobile, Alabama.  St. Paul's has been a member of the AHSAA since 1976.  (Ingram Aff. (doc. 24, Exh. A), ¶ 24 & Exh. A-21.)  A *bona* fide dispute has arisen between St. Paul's and AHSAA relating to certain athletic classification rules adopted by the AHSAA, to-wit: (i) a provision called the "Multiplier Rule" that was adopted in 1999; and (ii) a provision called the "Competitive Balance Factor" that was adopted in November 2017.  Plaintiff's pending Motion for Preliminary Injunction seeks an order restraining and enjoining the AHSAA from enforcing the Competitive Balance Factor rule against any of the Association's private school members.

At the beginning of each school year, the AHSAA promulgates the AHSAA Handbook, which compiles its Constitution, Bylaws and current rules and regulations in one location.  (Savarese Decl., ¶ 4.)  All member schools agree to be bound by the Constitution, Bylaws and rules set forth in the Handbook.  (*Id.*, ¶ 6.)  The Handbook confirms that "[m]ajor aims of the AHSAA are to serve the needs of its member schools in conducting their interscholastic athletic programs and to assist member schools in reaching the educational objectives as established by their school systems."  (*Id.*, ¶ 4 & Exh. B-1 at 94.)  According to the AHSAA's Constitution, "[t]he object of this Association shall be to promote pure amateur athletic competition in the high schools of Alabama."  (Doc. 24, Exh. B-1 at 16.)  The Constitution provides that management of the AHSAA's affairs is vested in a Legislative Counsel and a Central Board of Control.  (*Id.* at 17.)  The Central Board "shall have the power to classify member schools into two or more divisions for the purpose of athletic competition," and "shall have authority over any matter related to championship play."  (*Id.* at 20.)  The AHSAA Constitution further provides that

rulings made by the AHSAA's Executive Director may be appealed to the Central Board, which "has the authority to make the final decision on any case appealed to it." (*Id.* at 22.)

Pursuant to the Handbook, "High schools are divided into seven classifications (1A, 2A, 3A, 4A, 5A, 6A and 7A) for competition in championship programs." (*Id.* at 88.) As a general proposition, "Classification is based on Average Daily Membership (ADM) figures furnished by the State Department of Education for the upper three grades plus ninth grade students that are retained in the ninth grade." (*Id.*) For the 2018-2020 classification period, the relevant ranges of enrollment for AHSAA classification purposes include the following: (i) **4A**, 297.9 to 377.45; (ii) **5A**, 377.95 to 604.15; (iii) **6A**, 605.7 to 1045.6; and (iv) **7A**, 1046.55 to 2176.8. (Doc. 17, Exh. 5.) St. Paul's has a "true" (*i.e.*, unadjusted) enrollment of 310 students, which would place it near the bottom of the range for 4A classification. (Mask Aff. (doc. 17, Exh. 2), ¶ 3.) Under the challenged rules, however, St. Paul's has been classified by the AHSAA as 5A since the year 2000, and is slated to be classified as 6A in several sports (including, most notably, football) for the next four years, beginning in fall 2018. St. Paul's dissatisfaction with that classification result and its desire for an injunction preventing the AHSAA from implementing and enforcing it lie at the heart of the Complaint and the Motion for Preliminary Injunction.

### B. The 1.35 Student Multiplier Rule.

In 1999, the AHSAA's Central Board received proposals from five public-school members, requesting that non-public schools be excluded from competing in playoffs and/or state championship games. (Savarese Decl., ¶¶ 10-11.) Under these proposals, postseason play in the AHSAA would effectively be split, with public schools competing against public schools and private schools competing on a separate track against private schools. A stated rationale for these proposals was that "non-public schools can pick and choose their student enrollment whereas public schools cannot." (*Id.*, ¶ 10.) Surveys revealed that these proposals were favored by more than 70% of the Association's members. (*Id.*, ¶¶ 10-11.) In response to the members' concerns over private-school advantages, and in the interest of avoiding a split in postseason play, the Central Board approved an alternate proposal, under which a 1.35 multiplier would be used for each non-public school student to calculate adjusted enrollment for classification purposes (the "Multiplier Rule"). (*Id.*, ¶ 13.) Whereas each public-school student would count as one student for classification purposes, each private-school student would count as 1.35 students. The AHSAA Handbook summarizes this rule as follows: "An index of 1.35 is used to

determine the enrollment figure for classifying each private school member. Each private school student counts 1.35 for classification purposes." (Doc. 24, Exh. B-1 at 88.)

Upon implementation of the Multiplier Rule in 2000, 15 of the AHSAA's 29 non-public school members moved up at least one classification level. (Savarese Decl., ¶ 29.) One of those schools was St. Paul's, which ascended from 4A to 5A in all sports by operation of the Multiplier Rule. Despite being elevated in this manner, St. Paul's continued to excel in interscholastic athletic competition in many sports. For example, in football, St. Paul's has achieved a 165-61 overall record (for a winning percentage of .730) during the 18 seasons it has played at 5A, including 15 trips to the playoffs and state championships in 2007, 2014, 2015, and 2017. (Doc. 24, Exh. A-21.) From 2011-2017, St. Paul's football was particularly dominant against other 5A schools, with a gaudy record of 63-9 (for a winning percentage of .875) in head-to-head competition. (*Id.*)[2]

More broadly, non-public schools continued to win state championships at a much higher rate than their approximately 13% membership percentage in the AHSAA, even after implementation of the Multiplier Rule. From 2011-2016, AHSAA non-public schools won 38.1% of state championships in boys' sports, and 36.6% of state championships in girls' sports. (Savarese Decl., ¶¶ 15-16.) These outcomes raised substantial questions as to whether the Multiplier Rule went far enough to effectuate competitive balance within the AHSAA. A rational inference drawn from non-public schools' continued outsized success was that inherent advantages accruing to non-public school members were so pronounced that the Multiplier Rule was insufficient to offset those advantages and level the playing field.[3]

The internal and external pressure for AHSAA to take further steps to bring about competitive balance within the Association's ranks intensified in spring 2016, when a bill was introduced in the Alabama legislature that, if passed, would have segregated postseason and

---

[2] Nor was St. Paul's football success confined to similarly-classified schools. Between 2011 and 2017, St. Paul's compiled an 8-3 record against 6A and 7A schools. (Doc. 24, Exh. A-21.)

[3] One such perceived advantage accruing to private schools is their much higher rate of student participation in sports. An AHSAA survey conducted in 2015 showed that nearly four-fifths of non-public school students participated in school athletics in the 2014-2015 school year, as compared to less than one-third of public school students. (Savarese Decl., ¶ 18.)

championship play, with public schools competing only against public schools and private schools competing only against private schools. (*Id.*, ¶ 19.)[4] A similar bill surfaced in spring 2017. (Savarese Decl., ¶ 23.) Each time, the AHSAA's Executive Director appeared before the House Education Committee to defend the current system, in which private- and public-school members can and routinely do compete head-to-head in postseason and championship play. (*Id.*, ¶¶ 19, 23.)

### C.    *The Competitive Balance Factor Rule.*

The AHSAA's Central Board was keenly aware of the growing sentiment that the Multiplier Rule was insufficient to remedy perceived competitive imbalances between private schools and public schools. In April 2015, the Central Board formed a committee to study the Multiplier Rule and potential solutions for engendering a competitive balance between public and non-public member schools. (Hardin Aff. (doc. 24, Exh. E), ¶ 3.) Among the Central Board's stated reasons for assembling such a committee were the following concerns about differences between, and advantages and disadvantages of, public schools and private schools: (i) data revealing far higher sport participation percentages at private schools versus public schools; (ii) the disproportionate percentage of state championships won by non-public schools, at roughly triple their AHSAA membership share; (iii) the fact that non-public schools can use a selective process to control enrollment, while public schools cannot; (iv) the ability of non-public schools to cap enrollment, whereas public schools cannot; (v) the fact that certain non-public schools may not face salary constraints for coaching staff and constraints on number of coaching positions; (vi) the fact that certain non-public schools do not operate under budget restraints for facilities, as public schools often do; (vii) the fact that the Alabama Accountability Act provides financial assistance for non-public schools; and (viii) the difference in attendance zones, with non-public schools being able to draw students from multiple public schools' zones, whereas public schools have narrower zones. (*Id.*)

---

[4]    Section 1 of that bill, numbered HB364 and first read on March 3, 2016, provided as follows: "The Alabama High School Athletic Association shall adopt a rule to allow its public school members to compete only against each other for post regular season playoff games and state championships, and its nonpublic school members to compete only against each other for post regular reason playoff games and state championships which shall be effective in the 2018-2019 school year and in subsequent years." (Doc. 24, Exh. N.)

Pursuant to the Central Board's decision, a 15-member Classification Committee was convened in 2016. Five members of this committee were representatives of non-public schools, including the Committee Co-Chair, Anthony McCall, Athletic Director at The Montgomery Academy, and Tony Havard, Head of School at UMS-Wright in Mobile, Alabama, whose campus is located just two miles from St. Paul's. (Massey Aff. (doc. 24, Exh. D), ¶¶ 3-4.)[5] Between September 2016 and June 2017, the Classification Committee met on six occasions to review championship data, study classification modifications implemented by other states, and debate challenges and possible solutions relating to the classification of public and non-public schools. (*Id.*, ¶¶ 5-11; McCall Aff. (doc. 24, Exh. G), ¶¶ 5-8.) Uncontroverted evidence reflects that the Classification Committee meetings were conducted in an open and honest manner, fostering a productive dialogue in which each participant had a voice and members worked diligently to study these issues and identify the best possible solution. (Massey Aff., ¶¶ 12, 14, 16; McCall Aff., ¶¶ 10-13.)[6]

On June 15, 2017, the Classification Committee unanimously voted to recommend a plan called the Competitive Balance Factor ("CBF") to the AHSAA Central Board. (Massey Aff., ¶ 11.) In its final form, the CBF included the following salient features: (i) retention of the 1.35 enrollment multiplier for non-public schools; (ii) implementation of a competitive balance factor that takes effect when a non-public school team achieves a threshold level of points based on the

---

[5]     Given that non-public schools constitute 13% of the AHSAA's overall membership, whereas 33.3% of the committee's members represented non-public schools, it is evident that the Classification Committee was organized in such a manner as to provide non-public schools with an outsized voice in addressing these competitive balance issues.

[6]     For example, Committee Chair Matt Massey avers that the Committee's work was "a concerted effort to create a classification plan where all AHSAA members could compete and be competitive on a level playing field given the differences, advantages and disadvantages between public and non-public school members." (Massey Aff., ¶ 16.) Massey observes that "Committee members took great care and effort in discussing, analyzing, deliberating, and finally recommending the Competitive Balance Factor." (*Id.*, ¶ 14.) Likewise, Committee Co-Chair Anthony McCall (a private school representative) avers that "each member was allowed ample opportunity to express their views and opinions," that all Committee members appeared to be "sincerely trying to find a possible solution to the … differences, advantages and disadvantages between the public and non-public school members," and that his perception was that all "Committee members voted for what they believe to be the best and fairest way to level a playing field." (McCall Aff., ¶¶ 10, 12, 13.)

team's overall finish for each of the previous three seasons; and (iii) if the total number of points exceeds the designated threshold (which varies depending on the sport) for the previous three years, then that particular team would "level up" one class. (Doc. 1, Exh. B.)[7] The CBF has no ceiling, so a team could potentially ascend one class every classification period. (*Id.*)

The Classification Committee chose to recommend the CBF as a means of leveling the playing field and redressing perceived competitive imbalances in the AHSAA between public school and non-public school members. The Committee selected the CBF over other alternatives, such as increasing the 1.35 multiplier to 1.85 or 2.25, because it concluded that the CBF "would more effectively, fairly and accurately address the disproportionate percentage of state championships won by the non-public schools." (Massey Aff., ¶ 13.) Supporting data bears out this conclusion; indeed, the CBF, as designed, will alter the classification of only 85 of 820 (or 10.4%) of all non-public school teams. (*Id.*)

On July 26, 2017, the Classification Committee Chair, Matt Massey, appeared before the AHSAA's Central Board and explained that the Committee had unanimously recommended adoption of a CBF for the 2018-20 classification period. (Hardin Aff., ¶ 5.) Massey showed that the Committee had engaged in exhaustive and thorough studies, analyses and discussions of various options, after which the Central Board reviewed and debated the recommendation in detail. (*Id.*) On November 13, 2017, the Central Board met again and further discussed the proposed CBF. (*Id.*, ¶ 6.) The Central Board concluded that the CBF plan was preferable to increasing the multiplier because the latter option would affect a far greater number of non-public member schools. (*Id.*) On that basis, the Central Board voted unanimously to approve the CBF for the 2018-20 classification period, reasoning that it provided for "fair, equal, competitive opportunities for all schools and not just those that have consistently won in the quarterfinal, semifinal, or championship level in their class." (*Id.*) The Central Board's stated "hope" is that the CBF will allow all AHSAA teams to "compete on as fair a level of competition as possible."

_____

[7]     Specifically, if a private school's single-team sport (for example, wrestling) reached the quarterfinals, it would receive 1 point; for the semifinals, it would receive 2 points; and for the finals, it would receive 4 points. If the total number of points accrued by that school's wrestling team over the previous three years exceeded 6, then that team would level up one class. For co-ed sports (basketball, soccer, swimming, tennis, cross-country, track and bowling), the CBF works the same way, except that the threshold number of points required to "level up" is 11, rather than 6.

(*Id.*, ¶ 7.)  The Classification Committee is scheduled to reconvene at the conclusion of the 2018-2019 school year to review data.  (*Id.*, ¶ 8.)[8]

### D.    Plaintiff's Objections and Appeal.

As noted, the CBF plan affected only a small minority (roughly 10%) of non-public member schools' teams.  However, the impacts on St. Paul's are far more pronounced.  Under the CBF, St. Paul's football, volleyball, boys' golf, boys' and girls' indoor track, boys' and girls' outdoor track, boys' and girls' cross-country, boys' and girls' soccer, boys' and girls' tennis, and boys' and girls' swimming teams all move up one level from 5A to 6A for the 2018-20 classification period.  (Doc. 24, Exh. A-14 at 72-75.)  St. Paul's other teams, including baseball, softball, and basketball, will remain at the 5A level after application of the CBF.  (*Id.*)  Recall that on a "true," unadjusted enrollment basis (excluding the Multiplier Rule's effects), St. Paul's teams would be competing in the 4A classification.

On January 19, 2018, St. Paul's Head of School, N. Blair Fisher, sent an email to Savarese requesting that St. Paul's representatives be allowed to attend the AHSAA's January 31 meeting and "to be placed upon the meeting agenda."  (Doc. 24, Exh. B-4.)  Fisher indicated that "we would like to gain a better understanding of the recently adopted 'Competitive Balance Rule.'"  (*Id.*)  At Savarese's request, Fisher re-submitted the request on St. Paul's letterhead

---

[8]    Between Massey's presentation of the Committee recommendation on July 26, 2017, and the Central Board's vote on November 13, 2017, the AHSAA's Executive Director, Steve Savarese, was contacted by two outside physicians raising safety issues about the CBF. On October 11, 2017, Jeff Conrad, MD, head of the Sports Medicine Center at The Orthopedic Group PC in Mobile, sent an email to Savarese expressing concern about "the number of injuries (especially concussions) that these kids will sustain" when "you make a small school play 2 divisions above their true division."  (Doc. 17, Exh. 8.)  Dr. Conrad inquired as to whether the AHSAA had consulted the medical advisory board and suggested that if the CBF were adopted, then "contact and collision sports should be exempt due to the obvious injury concerns."  (*Id.*)  In an undated letter, Juan Ronderos, MD, likewise articulated concern that the CBF would "place[] the students at the smaller schools at a higher risk of traumatic brain injury especially concussions" because "with a much larger talent pool the schools with larger enrollment place a much higher percentage of larger and higher caliber athletes on the playing field," which "will put high school students at a higher risk of concussion and CTE."  (Doc. 17, Exh. 10.)  When these letters were brought to its attention, the Central Board directed the AHSAA's Medical Advisory Committee to review the stated concerns.  (Hardin Aff., ¶ 9.)  The Medical Advisory Committee reviewed the correspondence and reported to Savarese their assessment that "there is insignificant data to support the physicians' assertion that there is an increased risk of injury when a school plays another school in a higher class."  (Savarese Decl., ¶ 37.)

dated January 22, 2018.  In that letter, Fisher identified the St. Paul's representatives who would be attending, indicated that only he and Athletic Director Steve Mask wished to address the AHSAA Board, stated that St. Paul's wished to have its school counsel attend, and requested access to certain documents and records in advance.  (Doc. 24, Exh. B-6.)  Savarese responded via letter dated January 23, 2018, that St. Paul's had been placed on the agenda for the January 31 Board meeting, that St. Paul's would be allowed 10-15 minutes to make a presentation, and that only school personnel would be permitted to address the Board.  (Doc. 1, Exh. C.)  On January 31, St. Paul's representatives Fisher and Mask did, in fact, appear before the Central Board and expressed their concerns about the CBF.  (Savarese Decl., ¶ 29.)  Upon articulating their objections, Fisher and Mask requested that the CBF be vacated or, at a minimum, that its application be suspended "to allow more time for analysis and thoughtful reconsideration." (Doc. 24, Exh. B-8.)

The AHSAA invited St. Paul's to register an appeal of the adoption of the CBF rule.  On February 8, 2018, Fisher again wrote to Savarese to accept that invitation and express St. Paul's desire to lodge an immediate appeal.  (*Id.*)  Savarese responded by letter dated February 12, 2018, confirming that St. Paul's request for hearing had been granted and that the matter had been set for March 13, 2018.  (Doc. 24, Exh. B-9.)  The February 12 letter notified St. Paul's that (i) only the Central Board would hear the appeal; (ii) Article VII of the AHSAA Constitution conferred on the Central Board complete and final jurisdiction over all questions of the Constitution and Bylaws appealed by a member school, and also granted the Central Board the power to classify member schools into divisions for athletic competition; and (iii) St. Paul's would be allowed 10-15 minutes to make its presentation, and only school personnel may address the Board.  (*Id.*)

At the March 13 hearing, Fisher and Mask appeared before the Central Board and presented a 38-page PowerPoint presentation, culminating in two specific alternative proposals. (Savarese Decl., ¶ 32.)[9]  Following St. Paul's presentation, the Central Board deliberated and

---

[9]  Proposal One offered by St. Paul's was that the AHSAA eliminate the Multiplier Rule altogether, and use only the CBF to modify team classifications, with the CBF to apply equally to private and public-school members.  (Doc. 24, Exh. B-10.)  Proposal Two offered by St. Paul's was that the AHSAA not apply the CBF to contact sports (including football, (Continued)

then denied the appeal. (*Id.*) On March 14, 2018, Savarese sent a letter to St. Paul's thanking the school for its presentation, recognizing its "formal appeal to vacate or suspend the [CBF] for a period of two years," and announcing that "[f]ollowing a review of the information provided and considerable discussion, the Central Board of Control voted unanimously to deny the appeal and uphold the Constitution of the AHSAA." (Doc. 24, Exh. B-11.)

## III.    Claims Asserted and Relief Sought.

Two months after denial of its appeal, St. Paul's filed a 56-page Complaint for Injunctive and Declaratory Relief (doc. 1) against the AHSAA and Savarese (solely in his official capacity) in this District Court. The Complaint asserted three federal constitutional claims against the Association pursuant to 42 U.S.C. § 1983.[10] Count I is framed as an equal protection claim, alleging that the AHSAA's adoption of the CBF was motivated by "bare animus, and the classification (*i.e.*, public vs. private) was not rationally related to any legitimate purpose." (Doc. 1, ¶ 137.) St. Paul's alleges that the AHSAA's "actual motivation" for the new rule was "a bare desire to harm and disadvantage private schools (a politically unpopular and disfavored group), to appease certain public school officials and lawmakers, and thereby protect the Association's authority over high school athletics." (*Id.*, ¶ 138.)

In Count II of the Complaint, St. Paul's maintains that defendants deprived it of its constitutional right to substantive due process. To support this theory, St. Paul's pleads that it is entitled to constitutionally protected rights, such as the right to have the AHSAA promulgate

---

basketball and soccer) "until an agreed-upon comprehensive study on the potential risks of injuries is completed." (*Id.*)

[10]    In doing so, St. Paul's alleged that the AHSAA is a state actor for purposes of § 1983 and the U.S. Constitution. (Doc. 1, ¶ 135.) Defendants have not challenged this assertion, which appears to be well grounded in law. *See, e.g., Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 290-91, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) ("The issue is whether a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools may be regarded as engaging in state action when it enforces a rule against a member school. … We hold that the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association, there being no offsetting reason to see the association's acts in any other way."); *Communities for Equity v. Michigan High School Athletic Ass'n*, 459 F.3d 676, 692 (6th Cir. 2006) (applying *Brentwood Academy* to deem the Michigan High School Athletic Association a state actor for § 1983 purposes).

rules in a manner that does not substantially increase the risk of harm to student-athletes, the right to have the AHSAA exercise its power to classify in a manner that does not penalize private schools, the right to have the AHSAA create an environment of "pure" competition, the right to have the AHSAA promote private-school and public-school athletic programs equally, the right to have its student-athletes' achievements judged equally with those of student-athletes at public schools, and the right not to be treated unequally from public schools. (Doc. 1, ¶ 143.) St. Paul's posits that these purported "entitlements" were "created by express and/or implied contracts and mutually explicit understandings" between the AHSAA and its constituent member schools. (*Id.*, ¶ 144.)

Count III of the Complaint is framed as a § 1983 claim grounded in procedural due process. In this count, St. Paul's recites the same list of purported "entitlements" set forth in Count II, then alleges that defendants deprived it of those rights "without due process, including notice and an opportunity to be heard at a meaningful time and in a meaningful manner, and by applying the CBF in an *ex post facto* manner." (*Id.*, ¶ 154.)

Finally, in Count Four of the Complaint, St. Paul's brings a state-law claim for declaratory relief, seeking a declaration that the AHSAA adopted the CBF "in direct violation of the rights, interests, and expectations of its private school members, under the Association Handbook, Constitution, and Bylaws." (*Id.*, ¶ 161.)

Contemporaneously with its Complaint, St. Paul's filed a Motion for Preliminary Injunction and Request for Expedited Hearing (doc. 2). In that Motion, St. Paul's requests three forms of preliminary injunctive relief, to-wit: (i) an order that the AHSAA "be preliminarily restrained, enjoined, and prohibited from enforcing the CBF against any private school member;" (ii) an order that the AHSAA "classify its member schools for the 2018-2020 classification period using true, unadjusted enrollment;"[11] and (3) alternatively, an order that the AHSAA

---

[11] On its face, this aspect of the Motion appears to be requesting a preliminary injunction against enforcement of the Multiplier Rule that has been in effect since 2000, not merely the CBF adopted in 2017. In its Reply Brief, however, St. Paul's clarifies that it "seeks injunctive relief against the newly implemented Competitive Balance Factor," whereas the Multiplier Rule "will be addressed at some juncture." (Doc. 30, at 6.) In light of plaintiff's confirmation that its Motion for Preliminary Injunction is directed solely at implementation of the CBF, the Court does not consider and will not address the merits or constitutionality of the Multiplier Rule itself.

"indefinitely suspend enforcement of the CBF … until the CBF undergoes a comprehensive study by independent medical experts, the results of which shall be subject to meaningful opportunity for review and comment by the Association's member schools, and approved by this Court." (Doc. 2, at 30.)  The Motion has now been briefed on an expedited basis.

## IV.  Analysis.

### A.  *Legal Standard for Preliminary Injunctive Relief.*

A preliminary injunction may be entered only if the movant clearly establishes each of the following requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018); *see also American Civil Liberties Union of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1198 (11th Cir. 2009) (similar).  In applying this legal standard, the Court recognizes that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites."  *Keister*, 879 F.3d at 1287 (citations omitted); *see also FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (similar).

"Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits."  *American Civil Liberties*, 557 F.3d at 1198.  Where a plaintiff does not clearly establish a substantial likelihood of success on the merits, the remaining factors need not be considered.  *See Keister*, 879 F.3d at 1288 ("If Mr. Keister is unable to demonstrate a substantial likelihood of success on the merits, we do not need to address the remaining preliminary injunction requirements.") (citation omitted); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1329 (11th Cir. 2015) ("Because the plaintiffs have not shown a substantial likelihood of success on the merits, we need not consider the remaining factors in the preliminary injunction test.").[12]

---

[12]     The parties spar in their briefs over the applicability *vel non* of two recognized overlays to this legal test.  First, defendants invoke the principle that preliminary injunctions are particularly disfavored where a mandatory, rather than a prohibitory, injunction is sought.  *See, e.g., Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."); *Thompson v. Alabama*, 2017 WL 3223915, *4 (Continued)

## B.     Equal Protection Claim.

In Count I of the Complaint, St. Paul's alleges that "adoption of the CBF, by its design and by its application to private school members only, violates St. Paul's constitutional right to equal protection of the laws under the 14th Amendment." (Doc. 1, ¶ 137.) In support of this claim, St. Paul's pleads that the AHSAA "was moved to act and did act on bare animus, and the classification (*i.e.*, public vs. private) was not rationally related to any legitimate purpose." (*Id.*)

"Equal-protection claims generally concern governmental classification and treatment that impacts an identifiable group of people differently than another group of people." *Foley v. Orange County*, 638 Fed.Appx. 941, 944 (11th Cir. Jan. 29, 2016). "Where no fundamental right or suspect class is implicated, courts evaluate equal protection claims under the rational basis test." *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017); *see also Cook v. Bennett*, 792 F.3d 1294, 1301 (11th Cir. 2015) ("Rational basis review also applies to equal protection challenges concerned with a distinction between two groups drawn without reference

---

(M.D. Ala. July 28, 2017) ("[T]he burden of persuasion … becomes even greater where the relief requested is a mandatory injunction, as opposed to a prohibitory injunction.") (citation omitted). The hallmark of a mandatory preliminary injunction is that it forces a party to take action, as opposed to simply maintaining the status quo. *See, e.g., Antoine on behalf of I.A. v. School Board of Collier County*, 301 F. Supp.3d 1195, 1202 (M.D. Fla. 2018) ("An injunction that requires the defendant to act affirmatively alters the status quo and is thus mandatory."). Here, notwithstanding defendants' efforts to rephrase it in mandatory language, what St. Paul's seeks is an injunction barring the AHSAA from enforcing the CBF. That is a prohibitory injunction because it would not force defendants to take action; therefore, the heightened standard for a mandatory injunction is inapplicable. Second, defendants point to authority showing that undue delay in seeking a preliminary injunction may counsel against granting relief. *See, e.g., Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months – though not necessarily fatal – militates against a finding of irreparable harm."); *Mortensen v. Mortgage Electronic Registration Systems, Inc.*, 2010 WL 11425328, *8 (S.D. Ala. Dec. 23, 2010) ("unexplained delay may … preclude the granting of preliminary injunctive relief … because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief") (citation omitted). The facts and circumstances presented here do not support a determination of excessive delay. St. Paul's sought an opportunity to be heard by the AHSAA in January 2018, just two months after the rule was adopted. Plaintiff's appeal of the CBF rule was denied on March 13, 2018, and the Complaint was filed on May 24, 2018. In the context of a rule set to take effect in August 2018, these intervals do not warrant a conclusion that St. Paul's inequitably slept on its rights; therefore, plaintiff's Motion is not hampered by the stigma of undue, unexplained delay.

to a protected class, as is the case here.").  Plaintiff does not contend that either fundamental

rights or suspect classes are implicated by the CBF; nonetheless, plaintiff argues that the CBF is

subject to heightened review for equal protection purposes pursuant to the "Animus Doctrine."

(Doc. 30, at 3.)[13]  Plaintiff cites little authority delineating the contours of this doctrine, and not a

single Eleventh Circuit decision recognizing, much less applying, it.  At best, St. Paul's points to

*dicta* by the Supreme Court in the same-sex marriage context that "[t]he Constitution's guarantee

of equality must at the very least mean that a bare congressional desire to harm a politically

unpopular group cannot justify disparate treatment of that group."  *United States v. Windsor*, 570

U.S. 744, 769, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (citation and internal quotation marks

omitted).[14]

Even accepting plaintiff's characterization of the Animus Doctrine as accurate, the

contention that the CBF must face heightened scrutiny is not persuasive at the preliminary-

injunction stage.  Record evidence demonstrates the following: (i) the AHSAA is responsible for

preserving, maintaining and facilitating competitive balance among its members; (ii)

championship data shows that, even after implementation of the Multiplier Rule in 2000, private

school members of the AHSAA continued to achieve a disproportionate level of success in

interscholastic athletic competition, relative to their public school counterparts; (iii) the AHSAA

---

[13]    In its Reply, St. Paul's faults defendants for failing to address the Animus
Doctrine.  (Doc. 30, at 3.)  Such criticism is unfounded because plaintiff itself failed to analyze
that doctrine, or to specify clearly that it is relying on same, in its principal brief.  (*See* doc. 2, at
25.)  Defendants will not be penalized for not reading plaintiff's mind.

[14]    Even in a case involving a Colorado constitutional amendment "making a general
announcement that gays and lesbians shall not have any particular protections from the law," and
thereby raising "the inevitable inference that the disadvantage imposed is born of animosity
toward the class of persons affected," the Supreme Court applied a rational-basis analysis to an
equal protection claim.  *Romer v. Evans*, 517 U.S. 620, 634-35, 116 S.Ct. 1620, 134 L.Ed.2d 855
(1996).  The *Romer* Court explained that "a law must bear a rational relationship to a legitimate
governmental purpose" and struck down Amendment 2 because it is not "directed to any
identifiable legitimate purpose or discrete objective."  *Id.*  Under St. Paul's argument, heightened
scrutiny above and beyond rational-basis review was required, yet the *Romer* Court did not do
so.  As the Seventh Circuit has explained, even "[a]llegations of intentional discrimination do not
trigger strict scrutiny unless the victims of the discrimination belong to a suspect class.  Griffin
concedes that private schools have not historically been considered a suspect class."  *Griffin
High School v. Illinois High School Ass'n*, 822 F.2d 671, 675 (7th Cir. 1987).

formed a Classification Committee that spent many months examining the perceived advantages and disadvantages of public and private schools, and considering various alternatives to improve competitive balance, culminating in the CBF; (iv) the CBF, as implemented, affects only 10% of private-school teams, and is thus narrowly drawn to address the specific competitive-balance concerns identified by the AHSAA (*i.e.*, it does not punish or disadvantage private-school members across the board);[15] (v) the Classification Committee included five private school representatives, who voted unanimously to adopt the CBF; and (vi) no private school member of the AHSAA other than St. Paul's appears to have objected. On these facts, plaintiff has not shown a substantial likelihood that defendants were motivated by a "bare desire to harm a politically unpopular group" in adopting the CBF.[16] Rather, this record strongly suggests that AHSAA implemented the CBF measure as a carefully considered, narrowly tailored means of improving competitive balance within the Association in order to offset certain perceived advantages enjoyed by a small subset of perennially successful private-school members vis a vis certain of their public-school counterparts. This is not the stuff of "bare animus" or a peculiar effort to discriminate; therefore, plaintiff has not made a sufficient showing to trigger application of the Animus Doctrine.

---

[15] The Committee Chair averred that the CBF was designed to "[a]ffect the specific teams that had been consistently competing at the championship level because ***the least number of non-public schools would be [a]ffected***." (Massey Aff., ¶ 19 (emphasis added).) He described the care taken by the Committee to achieve "the fairest system to the non-public school members." (*Id.*) And the Committee Co-Chair, a non-public school representative, explained the Committee's efforts to achieve "the best and fairest way to level a playing field." (McCall Aff., ¶ 13.) This evidence appears irreconcilable with plaintiff's position that the AHSAA was driven by bias and bare animus to punish private schools because of their ostensibly "politically unpopular" status.

[16] Contrary to St. Paul's assertion, the group detrimentally affected by the CBF is not private schools in general. As noted, some 90% of private-school member athletic teams are wholly unscathed by implementation of the CBF; rather, the only group harmed by the CBF is a small subset of private-school members' athletic teams that have enjoyed sustained success at the statewide championship level in the recent past. That subset cannot logically be characterized as a "politically unpopular group." On this record, the CBF is far more reasonably viewed as an attempt to level the playing field for AHSAA members than a measure designed to punish private schools for being private schools.

That being said, the Court certainly appreciates that the CBF operates to the disadvantage of certain St. Paul's athletic teams, as well as those of certain other private-school members. However, the law recognizes that "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). The Supreme Court "reconcile[s] the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* Under the rational basis test, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.* at 632.[17] Using this deferential framework, a classification passes constitutional muster if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012) (citations omitted); *see also Locke v. Shore*, 634 F.3d 1185, 1196 (11th Cir. 2011) (on rational basis review, "a statute is presumed constitutional, and the burden is on the one attacking the law to negate every conceivable basis that might support it, even if that basis has no foundation in the record") (citation omitted). That is the proper standard by which to evaluate St. Paul's equal protection challenge to the CBF.

Defendants correctly state that promoting competitive balance in high-school athletics is a legitimate government interest. *See, e.g., Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir. 1981) (rule treating student-athletes who attend summer athletic camps differently from student-athletes who do not passes rational-basis review because it "seeks to achieve a balance in

---

[17]     *See generally Cook*, 792 F.3d at 1301 ("On rational basis review, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.") (citation and internal marks omitted); *see also United States v. Campos-Diaz*, 472 F.3d 1278, 1280 (11th Cir. 2006) ("Under the rational basis test, a law does not violate equal protection so long as it is rationally related to a legitimate government interest.") (citation and internal marks omitted).

interscholastic athletics").[18] As such, the CBF is presumed to be constitutional, and it is St. Paul's burden to negate every conceivable basis that might support the AHSAA's adoption of the CBF as having been in furtherance of achieving competitive balance. St. Paul's has not shown a substantial likelihood of being able to shoulder that heavy burden. Here is why: Defendants' data illustrates that private-school members have won a disproportionate percentage of state championships in recent years.[19] What's more, the imbalance appears to have worsened during

---

[18] *See also Cornerstone Christian Schools v. University Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009) (association's rule distinguishing between public and nonpublic schools "bears a rational relationship to the state's interest in reducing unfair competition"); *Griffin High School*, 822 F.2d at 675 (where state association adopted policy "to place public schools on an equal footing with private schools with regard to student recruitment," finding purpose to be "a legitimate one for the IHSA"); *Jones v. Washington Interscholastic Activities Ass'n*, 342 Fed.Appx. 264, 266 (9th Cir. June 19, 2009) (recognizing association's "legitimate state interest of creating safe and equitable competition for student athletes"); *Mitchell v. Louisiana High School Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970) (LHSAA's eligibility rules promote a legitimate state interest because they "are designed to assure fair competition among its member schools, and between individuals"); *B.A. v. Mississippi High School Activities Ass'n, Inc.*, 983 F. Supp.2d 857, 864 (N.D. Miss. 2013) (rule limiting number of players for high-school sport who could play on the same independent team passed rational-basis review where its purpose "was to promote fair competition among the member schools, and encourage student participation"); *Valencia v. Blue Hen Conference*, 476 F. Supp. 809, 826 (D. Del. 1979) ("the provision of the BHC constitution excluding private schools is supported by legitimate State interests, namely, the prevention of recruiting and the maintenance of a competitive balance").

[19] For example, during the 2017-2018 academic year, private-school boys' teams won 36.2% of state championships and 31.0% of the runner-ups, while private-school girls' teams won 41.5% of state championships and 28.3% of the runner-ups. (Doc. 24, Exh. A-11.) By comparison, just 51 of the AHSAA's 412 members (or 12.4%) were private schools during this time period. (*Id.*) These results are consistent with prevailing trends. From 2011-2016, boys' and girls' private-school teams won 38.1% and 36.6%, respectively, of Alabama state championships in the AHSAA. (Doc. 24, Exh. A-9.) Nor does attempting to slice and dice the numbers by sport materially alter the result. Indeed, private-school members make up 8.88% of the AHSAA's football programs, yet won 21.9% of state championships from 2011-2016. (Doc. 24, Exhs. A-8 & A-9.) In baseball, the 11.25% of AHSAA teams that are private schools won 50% of the state championships during that period. (*Id.*) In girls' soccer, the 20.93% of teams that are private schools won 50% of the state championships. (*Id.*) In boys' basketball, 12.1% of the AHSAA teams were private schools, yet they won 23.7% of the championships. (*Id.*) Defendants have also presented data showing that the private/public differentials persist and are robust within many specific classifications in many specific sports at the micro level. For example, in 2011-2016, private-school boys' soccer teams made up 18.5% of the total in classes 4A-5A, yet they won 66.7% of the championships. (Doc. 24, Exh. D-1.) Private-school girls' (Continued)

the last two decades, despite the AHSAA's implementation of the Multiplier Rule in 2000 to address competitive imbalance issues between private and public schools.[20]  Given these numerical trends, it appears at least reasonably conceivable that the AHSAA's decision to classify highly successful private-school teams differently via the CBF was made for the purpose of advancing the legitimate state interest in promoting competitive balance in high school athletics.  Thus, St. Paul's has not met its heavy burden at the preliminary injunction stage of showing that it is substantially likely to be able to negate every conceivable basis that might support the CBF.

In its reply brief, St. Paul's focuses on arguing that the perceived "advantages" enjoyed by St. Paul are illusory and that "there are no practical distinctions between public and private schools." (Doc. 30, at 10-16.)  However, under rational basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *see also Cook*, 792 F.3d at 1300 ("A law need not be sensible to pass rational basis review; rather, it may be based on rational speculation unsupported

---

volleyball teams constituted 4% of the total in classes 5A-7A, yet they won 41.7% of the championships.  (*Id.*)  Private-school football teams were 14% of the total in classes 3A-4A, yet they won 40% of the championships.  (*Id.*)

[20]      In that regard, the percentage of AHSAA boys' state championships won by private-school members rose from 18.7% in 1991-2000 (the last decade before adoption of the Multiplier Rule) to 29.5% in 2001-2010 to 38.1% in 2011-2016.  (Doc. 24, Exh. A-9.)  For girls' state championships, private schools won 29.2% in 1991-2000, 35.6% in 2001-2010, and 36.6% in 2011-2016.  These trends in the data support a narrative that AHSAA private schools' disproportionate rate of success has increased over time, such that the private/public gap has widened, despite adoption of the Multiplier Rule beginning in 2000.  Given these facts, the Court finds unpersuasive plaintiff's argument that the "strongest evidence against CBF's constitutionally is the Student Multiplier" because the Multiplier Rule was imposed to offset private school advantages, which somehow "undermines any notion that the CBF was implemented to offset any of these 'advantages.'"  (Doc. 30, at 16.)  Contrary to St. Paul's argument, the data lends strong support to a rational conclusion that the Multiplier Rule was inadequate to offset private-school advantages and achieve competitive balance.  Beause the Multiplier Rule did not appear to have its intended effect of leveling the playing field between private schools and public schools, the AHSAA could rationally have concluded that additional measures (*i.e.*, the CBF) were desirable to advance the legitimate state interest of competitive balance in interscholastic high school athletic competition.

by evidence or empirical data.") (citation and internal quotation marks omitted). Having examined data showing that private-school members are experiencing outsized success at the state championship level, the AHSAA was permitted to engage in "rational speculation unsupported by evidence or empirical data" to conclude that private schools' disproportionate success resulted from advantages they enjoyed vis a vis public-school members, such that the classification enacted through the CBF could be said to advance the legitimate state interest of leveling the playing field. The AHSAA "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Plaintiff's attempt to quarrel with the empirical validity of each perceived advantage ascribed by the AHSAA to private schools is at odds with these principles.

Besides, even if St. Paul's were correct that negating the validity of the perceived "advantages" to private schools would be sufficient to enjoin enforcement of the CBF on rational-basis review (notwithstanding the baseline evidence that private schools have experienced vastly disproportional success in championship athletic achievement), plaintiff still has not shown a substantial likelihood of success on the merits that might warrant entry of a preliminary injunction on an equal protection theory. Three examples will illustrate the point.[21]

---

[21]    Defendants cite a litany of perceived advantages accruing to private-school members that rationally could have provided the impetus for exploration and adoption of the challenged classification. Those advantages include the following: (i) the much higher sport participation percentages in non-public schools than in public schools; (ii) the ability of non-public schools to control their enrollment through a selective enrollment process, whereas public schools cannot; (iii) the ability of non-public schools to cap enrollment, which public schools cannot do; (iv) the absence of limits on salaries for coaching staff and for the number of coaches or teaching positions at a number of non-public schools; (v) the lack of budget restraints for facilities at a number of non-public schools; (vi) the availability of financial assistance for non-public schools pursuant to the Alabama Accountability Act; and (vii) the larger attendance zones for non-public schools that allow them to draw from a much broader geographic area for eligibility purposes. (Hardin Aff., ¶ 3.) Each of these is a "conceivable basis" that might support the challenged classification; therefore, St. Paul's bears the burden of negating each and every one of them. It has attempted to do just that. (Doc. 30, at 10-16.) In the interest of efficiency and judicial economy, rather than working through all seven of these conceivable bases, the Court has selected three areas in which St. Paul's showing falls short of establishing a substantial likelihood of success on the merits. In doing so, the Court neither finds nor suggests that St. Paul's has met its burden with respect to the other four enumerated advantages.

First, defendants identified as a key advantage accruing to private schools the fact that sport participation rates are much higher in AHSAA private schools than in public schools. To that end, defendants point to a study conducted by AHSAA's director of communications showing that, during the 2014-2015 school year, nearly 80% of private-school students participated in school athletics, compared to just 30% of public-school students. (Doc. 24, Exh. A-7; Savarese Aff., ¶ 18.) Plaintiff challenges the study's methodology, but does not effectively cast doubt on the persistence of a significant gap in participation rates.[22] Also, plaintiff posits that it would be "completely irrational" to classify private and public schools differently because of divergent participation rates, but offers no convincing explanation why. (Doc. 30, at 14.) On this record, the Court cannot say it was irrational for the AHSAA to conclude that private schools enjoy a competitive advantage over similarly-sized public schools by virtue of the former's much higher athletic participation rates,[23] which in turn furnishes a rational basis for the challenged classification.

Second, the AHSAA identified as a competitive advantage enjoyed by private schools their ability to control their enrollment via a selective process, whereas public schools lack such control, as well as the much larger attendance zones for private schools which enable them to accept students from a larger area. (Hardin Aff., ¶ 3.) Plaintiff rails against this purported "advantage," arguing that many public school districts in Alabama also allow open, selective enrollment of students from beyond their geographic boundaries. (Doc. 1, ¶¶ 83-86; doc. 30, at

_____

[22]     In particular, St. Paul's laments the study's failure to account for students playing multiple sports. Because the study added the rosters of all sports teams at a school, then divided "roster totals" by enrollment, it double-counted students who participated in multiple school sports. (Doc. 30, at 13-14.) Plaintiff's critique appears to be correct; however, plaintiff points to no evidence and no reason to believe that controlling for multiple-sport student-athletes would change the observed disparity in participation rates. The absolute numbers of those participation rates are not important; rather, what matters are the relative magnitudes for private and public schools. Stated differently, plaintiff makes no showing that the percentage of multiple-sport athletes is so much higher at private schools than at public schools as to make the AHSAA's observed gap in participation rates illusory, or a mere statistical artifact.

[23]     To illustrate the point, suppose School A and School B each have an enrollment of 300 students. Next, suppose the athletic participation rate in School A is 60% while that in School B is just 30%. In that scenario, School A has a pool of 180 student-athletes, whereas School B has only 90. It would certainly appear plausible that, all else being equal, School A would be favored over School B in interscholastic athletic competition by that circumstance.

10-12.)  Notwithstanding St. Paul's criticism, it appears rational for the AHSAA to conclude that private schools have greater discretion to shape and mold both the size and the composition of their student bodies than do public schools.[24]  It requires no great leap of logic to perceive how such disparate levels of control may be leveraged by private schools to create a competitive advantage in interscholastic athletics.  Likewise, while St. Paul's shows that public schools can engage in selective enrollment of students from out-of-zone, it has no effective response to defendants' evidence that private-school attendance zones are broader than public-school zones, such that private schools are generally able to cast a wider net to recruit student-athletes than public schools can.[25]  Stated differently, the general rule is that students attending a school out-of-zone are prohibited from participating in school athletics for one year,[26] which diminishes AHSAA member schools' ability to recruit student-athletes from outside their zone.  If private-school attendance zones are more expansive than public-school attendance zones, then it stands to reason that private schools are better able to recruit and accept students from a broader geographic area.[27]  On this record, St. Paul's has not shown a substantial likelihood of success in

---

[24]     Plaintiff shows that certain public schools can and do recruit students, suggesting that private and public schools are actually no different on this metric.  But defendants' point is more nuanced, to-wit: regardless of recruiting that may happen at the margins, public schools are generally obligated to accept all comers from their designated zone.  Private schools, by contrast, are not, but generally may select whomever and however many students they wish.  At the very least, it is not irrational to perceive this to be a *bona fide* difference.

[25]     At most, plaintiff offers evidence that St. Paul's draws much of its student population from a smaller geographic area than many public-school attendance zones.  (Doc. 1, Exh. F, ¶ 4; doc. 1, Exh. G, ¶ 3.)  Of course, anecdotal evidence about the recruitment practices and student population dispersion of one (or even a handful of) private schools says nothing about the rationality of the AHSAA's reasoning and conclusions as pertaining to its member schools as a whole.

[26]     The one-year rule is documented in the AHSAA Handbook, Rule I, Section 12 of the Bylaws, which reads in pertinent part as follows: "**Non-Resident Attendance Requirement.** Any student, after completing one year's attendance in a school and fulfilling all other requirements, becomes eligible in that school …."  (Doc. 17, Exh. 4 at 32.)  Likewise, in the "Questions and Answers" section, the Handbook recites the following exchange: "May a student establish eligibility by attendance in a school [zone] where his parents do not reside? Yes.  After one year's attendance the student may become eligible."  (*Id.* at 77.)

[27]     At most, St. Paul's points to a provision apparently adopted by the AHSAA reflecting that "[a] student enrolled in a school that appears on the current Failing Schools list … (Continued)

negating private schools' greater flexibility and control in selecting their student populations. That perceived advantage in turn would furnish a rational basis for the challenged classification.

Third, the AHSAA identifies as a competitive advantage for private schools the greater financial resources and fewer budgetary restrictions that "a number of non-public schools" face for facilities and coaching staffs, as compared to public schools. (Hardin Aff., ¶ 3.) In attempting to negate this private-school advantage, St. Paul's points to evidence that four public-school members of AHSAA have recently received multi-million dollar facilities upgrades, that St. Paul's major buildings are more than a quarter-century old, that certain public-school coaches are paid in excess of $100,000, and that St. Paul's is subject to budgetary restrictions in coach staffing and compensation. (Doc. 30, at 15-16.) This kind of anecdotal evidence does not suffice to invalidate a classification on rational-basis review. For aught the record shows, plaintiff's cited examples may be outliers in no way representative of the norm. Moreover, the necessary rational basis may be the product of "rational speculation unsupported by evidence or empirical data." *Beach Communications*, 508 U.S. at 315.[28] Under the circumstances, the Court

---

may transfer to a non-failing school within the same school system and academic eligibility will not be affected." (Doc. 17, Exh. 17.) On its face, this rule only excuses the one-year waiting period for public-school students transferring from a "failing school" to another school within the same district. It does nothing to alter or abridge the one-year delay on eligibility for all other out-of-zone transfers.

[28] The general proposition that, on average, private schools have greater resources available for interscholastic athletics than public schools does not appear to be controversial. Although the AHSAA has not presented empirical evidence to support that premise, it had no obligation to do so. *See, e.g., Leib v. Hillsborough County Public Transp. Com'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) ("As the Supreme Court has held, under rational basis review, a state has no obligation to produce evidence to sustain the rationality of a statutory classification.") (citation and internal quotation marks omitted). All that is necessary is for the rationale to be arguable, not that it be accurate. *See, e.g., Lofton v. Secretary of Dep't of Children and Family Services*, 377 F.3d 1275, 1277 (11th Cir. 2004) ("It could be that the assumptions underlying these rationales are erroneous, but the very fact that they are *arguable* is sufficient, on rational-basis review, to immunize the legislative choice from constitutional challenge.") (citation omitted). Again, the test is whether there is a reasonably conceivable state of facts that could support the challenged classification (*i.e.*, whether it is reasonably conceivable that private schools might have a competitive advantage over public schools in athletic competition by virtue of greater financial resources, so as to justify imposition of the CBF for competitive-balance reasons). St. Paul's has not met its burden of showing a substantial likelihood that no such conceivable state of facts exists.

cannot say St. Paul's has met its burden of showing a substantial likelihood that the FHSAA could not rationally have believed that a disparity in financial resources conferred a competitive advantage on private-school members, so as to warrant adoption of the CBF to level the playing field.

The conclusion is straightforward: Defendants have identified numerous perceived advantages that private-school members enjoy over their public-school counterparts that may contribute to the observed result of private schools experiencing disproportionate success on the athletic field. Defendants say the CBF was implemented to neutralize those advantages, in furtherance of the legitimate state interest of promoting competitive balance. In order for a preliminary injunction to be appropriate on the equal protection claim, St. Paul's must, by a substantial likelihood, both (i) show that private schools' disproportionate success did not itself provide a rational basis for the CBF rule, and (ii) negate all conceivable competitive advantages for private schools that could have furnished a rational basis for the CBF rule. As demonstrated by the foregoing, St. Paul's has not met this heavy burden.

St. Paul's also seeks to establish a likelihood of prevailing on its equal protection claim by arguing that certain public-school members of the AHSAA have also enjoyed outsized success on the athletic field. To that end, St. Paul's points out that certain public-school teams have also achieved consistent success as measured by the CBF.[29] Plaintiff argues that this data proves the irrationality of the AHSAA's adoption of the CBF, because that rule does not correct competitive imbalances arising from sustained athletic excellence by a tiny percentage of public-school programs. (Doc. 30, at 9.) This contention essentially amounts to second-guessing the AHSAA's judgment, and arguing that the Association should have done something more or different to promote the legitimate state interest of competitive balance.

---

[29] For instance, plaintiff's calculations show that "if the Success Test applied to public schools, at least 70 public schools teams from 38 different schools would 'level up' one classification in the 2018-2020 Classification Period." (Doc. 1, Exh. H, at ¶¶ 20-21 & Exh. 1.) But these figures actually support the AHSAA's decision to focus on private schools. By plaintiff's own reckoning, just 70 out of more than 5,000 public-school teams (or less than 2%) would be affected by the CBF, as opposed to more than 10% of private-school teams. Based on this data, defendants could rationally have concluded that efforts to improve competitive balance within the Association should be focused on private schools because that is where the more pronounced imbalance lies.

The fundamental defect with that line of reasoning is that the rational-basis standard does not obligate defendants to implement a solution that amounts to a perfect fit between means and ends, that promotes the proffered state interest (*i.e.*, eradicating competitive imbalance) to the greatest possible extent, or that avoids all inequality. *See, e.g., Heller*, 509 U.S. at 321 ("A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.") (citations and internal quotation marks omitted); *see also Locke*, 634 F.3d at 1197 ("Under rational basis review, a court must accept a legislature's generalizations even when there is an imperfect fit between means and ends.") (citation omitted). "The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific." *Heller*, 509 U.S. at 321 (citation omitted). The AHSAA identified a problem, to-wit: private schools were winning a disproportionate (and growing) percentage of state championships. The AHSAA rationally could have perceived private schools' outsized success to be the product of differences between private schools and public schools. In the interest of furthering its interest in fostering competitive balance, the AHSAA devised the CBF as a means of addressing that problem by requiring the most successful private-school teams to "play up" to a higher level for a discrete period of time. This mechanism appears to bear a rational relationship to the problem it was designed to solve. That the AHSAA may not have undertaken the most comprehensive, ideal or perfect means available to root out all competitive imbalances among its membership in no way destroys the requisite rational nexus between the legitimate state interest (*i.e.*, competitive balance) and the challenged classification (*i.e.*, the CBF) in this case.[30]

More broadly, it bears emphasis that the Court's determination that St. Paul's has not shown a substantial likelihood of success on its equal-protection claim is animated in substantial measure by the deferential legal standard. The Supreme Court has repeatedly instructed that rational-basis review does not authorize lower courts to pass judgment on the wisdom or fairness

---

[30]  *See generally Craigmiles v. Giles*, 312 F.3d 220, 223-24 (6th Cir. 2002) ("Even foolish and misdirected provisions are generally valid if subject only to rational basis review."); *Robbins by Robbins v. Indiana High School Athletic Ass'n, Inc.*, 941 F. Supp. 786, 794 (S.D. Ind. 1996) ("In this case, the rule at issue addresses what people who run our schools perceive as a problem – school jumping for athletic purposes. They addressed that problem in a manner that is imperfect – but is not irrational or unreasonable. The place to change that rule is through the IHSAA rule promulgation procedure, and not by court fiat.").

of a challenged classification. *See, e.g., Heller*, 509 U.S. at 319 ("We many times have said …

that rational-basis review in equal protection analysis is not a license for courts to judge the

wisdom, fairness, or logic of legislative choices.") (citations and internal quotation marks

omitted).[31] It is not the function of this Court to decide whether the CBF is the best way – or

even a good way – of promoting competitive balance among the AHSAA's membership. All

that matters is whether St. Paul's has shown a substantial likelihood that the CBF is an irrational

way of furthering the legitimate state interest in achieving competitive balance in interscholastic

athletic competition. For purposes of the Motion for Preliminary Injunction, the Court finds that

it has not; therefore, preliminary injunctive relief is not appropriate on plaintiff's equal protection

cause of action.

### C. Substantive Due Process Claim.

In Count II of the Complaint, St. Paul's alleges a claim for deprivation of its

constitutional right to substantive due process. According to St. Paul's, the AHSAA Constitution

and Bylaws create a contract between it and the AHSAA, supplemented by "mutually explicit

understandings" set forth in the Handbook. On that basis, St. Paul's maintains that

constitutionally protected property interests have been created. (Doc. 1, ¶ 144; doc. 30, at 18-

19.) The crux of the substantive due process claim is that, by adopting the CBF, the AHSAA

deprived St. Paul's of those property rights in a manner that was (i) "not rationally related to a

legitimate purpose," and (ii) performed with "a deliberate indifference to, and in conscious

disregard of, excessive, known, and clear risks to the health and safety of private school student-

---

[31] *See also Schweiker v. Wilson*, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) ("although this rational-basis standard is not a toothless one, … it does not allow us to substitute our personal notions of good public policy for those of Congress") (citation and internal quotation marks omitted); *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) ("In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."); *Deen v. Egleston*, 597 F.3d 1223, 1230 (11th Cir. 2010) (observing that equal protection "is not an obligation to provide the best governance possible," and that "[b]ecause it is fundamentally the people who are empowered to overturn unwise social and economic laws, the role of the judiciary is accordingly limited") (citations omitted); *Lofton*, 377 F.3d at 1277-78 (challenged classification may survive rational-basis review "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous") (citation omitted).

athletes." (Doc. 1, ¶¶ 146-47.) To be entitled to a preliminary injunction on a substantive due process theory, St. Paul's must show a substantial likelihood of success on the merits.

As a threshold matter, plaintiff's showing on Count II suffers from a substantial logical gap. It is well-settled that "there is generally no substantive due process protection for state-created property rights." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014).[32] The purported property rights identified by St. Paul are not created by the Constitution, but by an independent source such as state law. *See, e.g., Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."). Plaintiff has neither pleaded nor explained how Count II overcomes the general rule that property rights created by state law are not protected by substantive due process.[33]

Assuming the property rights identified by St. Paul's are subject to substantive due process protection, the next steps are to define precisely what those property rights are and to determine whether plaintiff has shown a substantial likelihood that a deprivation has occurred. It

_____

[32]    *See also Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002) ("In order to have a substantive due process claim, Vinyard must have a substantive right created by the Constitution."); *DeKalb Stone, Inc. v. County of DeKalb, Ga.*, 106 F.3d 956, 959-60 (11th Cir. 1997) (recognizing that "property rights generally[] are state-created rights," and that no substantive due process claim is stated where a plaintiff "has alleged an executive violation of a state-created property right, not a deprivation of any constitutional right"); *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) ("areas in which substantive rights are created only by state law … are not subject to substantive due process protection under the Due Process Clause because substantive due process rights are created only by the Constitution") (citation and internal quotation marks omitted); *Goodman v. City of Cape Coral*, 581 Fed.Appx. 736, 739 n.2 (11th Cir. July 28, 2014) (observing "general rule that substantive rights created by state law are not protected by substantive due process").

[33]    The Court is aware of Eleventh Circuit precedent recognizing "[a]n exception to the general rule that substantive rights created by state law are not protected by substantive due process … when the substantive state rights are infringed by legislative rather than by executive acts." *Goodman*, 581 Fed.Appx. 736, 739 n.2 (11th Cir. July 28, 2014); *see also Kentner*, 750 F.3d at 1279-80 ("Where a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action.") (citation omitted). But plaintiff has not invoked that exception, much less made any showing that it is applicable here.

is well-settled that an individual has a protected property interest when he has "a legitimate claim of entitlement" to a government benefit, which claim of entitlement must "come from an independent source," such as a statute, a regulation, "an express or implied contract, … or a mutually explicit understanding." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012). Plaintiff says that the AHSAA Constitution, Bylaws and Handbook are the source of its "legitimate claim of entitlement" in this case. As will be discussed in Section IV.E., *infra*, however, St. Paul's has not made a substantial showing of a likelihood of success on its contention that the CBF violates any provision of any of these documents. Rather, plaintiff attempts to extrapolate from general, precatory and aspirational statements contained in the Constitution, Bylaws and Handbook, using selective quotations, wishful thinking, and assumptions not grounded in the text of those materials to conjure up explicit promises and guarantees that were never made. The Court therefore is of the opinion that St. Paul's has failed to meet its burden of showing a substantial likelihood of success on the claim that the AHSAA infringed upon state-created property rights.

Even if plaintiff had made a showing of a deprivation of protected property rights, preliminary injunctive relief on a substantive due process theory would remain inappropriate. "Like equal protection claims, substantive due process claims are subject to rational basis review, so long as they do not infringe fundamental rights and are not discriminatory." *Leib v. Hillsborough County Public Transp. Com'n*, 558 F.3d 1301, 1308 (11th Cir. 2009); *see also Kentner*, 750 F.3d at 1280 ("Substantive due process challenges that do not implicate fundamental rights are reviewed under the 'rational basis' standard."). The rational-basis test for substantive due process claims works the same way as the rational-basis test for equal protection claims. *See, e.g., Cook*, 792 F.3d at 1301 ("Rational basis review in the context of equal protection is essentially equivalent to rational basis review in the context of due process."); *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1338 n.10 (11th Cir. 2002) ("the rational basis test utilized with respect to an equal protection claim is identical to the rational basis test utilized with respect to a substantive due process claim"). As such, St. Paul's has failed to show a substantial likelihood of striking down the CBF on rational-basis review in the substantive due process context for precisely the same reason that it has failed to show a substantial likelihood of striking down the CBF on rational-basis review in the equal protection context, as discussed *supra*. *See Gary*, 311 F.3d at 1338 n.10 ("because Gary's substantive due process claim requires

application of the same test as that for her equal protection claim and the same facts are involved, we need not reiterate our analysis").

As an alternative to arguing that the CBF violates substantive due process because it flunks rational basis review, St. Paul's pleads a theory that its substantive due process rights were violated because the AHSAA "acted … with a deliberate indifference to, and in conscious disregard of, excessive, known, and clear risks to the health and safety of private school student-athletes" in adopting the CBF. (Doc. 1, ¶ 147.) In so doing, plaintiff invokes a line of authority holding that even in the absence of fundamental rights, "substantive due process nonetheless protects against the arbitrary and oppressive exercise of government power. … Executive action is arbitrary in a constitutional sense when it 'shocks the conscience.'" *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017); *see also Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013) ("conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense") (citation omitted). This is an extremely rigorous standard requiring far more than mere negligence. *See Waldman*, 871 F.3d at 1292-93 ("Only the most egregious conduct is sufficiently arbitrary to constitute a substantive due process violation," such as "conduct designed to injure someone in a fashion that is not justified by any government interest," as when a coach deliberately struck a high school student's eye with a heavy object using enough force to cause permanent blindness); *Maddox*, 727 F.3d at 1119 ("Conduct intended to injure in some way that is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). Indeed, "even intentional wrongs seldom violate the Due Process Clause." *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). Certainly nothing in the factual record submitted by St. Paul's shows a substantial likelihood that the AHSAA adopted the CBF with the intent to cause serious physical injuries to private school students.

Nonetheless, plaintiff maintains that the "shocks the conscience" standard may still be met here pursuant to the Eleventh Circuit's *Waddell* decision. The panel in that case opined that in non-custodial settings, "a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position." *Waddell*, 329 F.3d at 1306. Omitted from plaintiff's discussion is that *Waddell* also cautioned that it was not ruling out the possibility that "the correct legal threshold

… is actually far higher," and that the standard articulated therein "may well be too low a point." *Id.* at 1306 n.5.[34] At any rate, the record here does not establish a substantial likelihood that AHSAA's adoption of the CBF shocked the conscience. To the contrary, the AHSAA was confronted with data showing a competitive imbalance between private-school members and public-school members. It formed a 15-member committee (including five private-school representatives) that studied the issue over a nine-month period before recommending the CBF. Upon receiving comments from the public expressing concern that the CBF would increase the risk of injury for private-school student-athletes, the AHSAA referred those communications to its Medical Advisory Committee, whose co-chair is a physician with extensive experience and expertise in the area of sports-related concussions. That Medical Advisory Committee studied the matter and informed the AHSAA of its conclusion that there was insignificant data to support an assertion that risks of injury increase when schools play schools in higher classifications.[35]

---

[34] In 2012, the Eleventh Circuit reaffirmed that "[a]t the very least, in a non-custodial setting a substantive due process violation – as we have said in some other non-custodial settings – requires the plaintiff to make a showing of deliberate indifference to an extremely great risk of serious injury, ***although the required showing might actually be far higher***." *Doe v. Braddy*, 673 F.3d 1313, 1318 n.4 (11th Cir. 2012) (emphasis added).

[35] In particular, the Committee's Medical Director and Co-Chair, James Bryan Robinson, M.D., opined as follows: "Without a doubt, the concerns over concussion and its risks and long term effects in student-athletes are incredibly important. However, based upon my education, training, experience, and extensive practice working with athletes at both the high school and collegiate level, I do not believe that the Competitive Balance Factor places the student-athletes at increased risk for injury including concussion; and I am not aware of any study on that issue." (Robinson Aff. (doc. 24, Exh. C), ¶ 21.) Among other relevant qualifications and experience, Dr. Robinson (i) has served as the Medical Director for the University of Alabama Department of Athletics since 1997; (ii) supervises 14 athletic trainers at DCH Sports Medicine and oversees their care of athletes at local high schools; (iii) served as a member of the Alabama Sports Concussion Task Force for the State of Alabama; (iv) served on the Board of Directors for the Alabama Head Injury Foundation; (v) is the team physician for four Alabama high schools, and medical consultant for 11 additional high schools; and (vi) was directly involved in the formulation of the AHSAA's Concussion Rule and Contact Limitation Rule. (*Id.*, ¶¶ 3-11.) It was not likely deliberately indifferent for the AHSAA to consult Dr. Robinson's Committee on this issue and to accept their advice. More broadly, record evidence shows that the AHSAA has been at the forefront of efforts to make high school football safer, including mandatory concussion training for coaches and schools, as well as requirements that a physician must clear students to return to play once signs and symptoms of concussions have been detected. (Doc. 24, Exh. B-16.) Such a track record is inconsistent with the deliberate indifference now ascribed to the AHSAA by St. Paul's.

Further, the record shows that St. Paul has voluntarily scheduled games against 6A and 7A opponents for years,[36] which it obviously would not have done had it believed its student-athletes faced an elevated risk of concussions and other serious injury as a result of such matchups.

To be clear, the Court need not – and does not – make a definitive ruling at this time about whether the CBF does or does not expose St. Paul's student-athletes to a greater risk of injury by "levelling up" plaintiff's football program to the 6A classification (as opposed to the 4A classification it would hold based solely on enrollment, unadjusted by the Multiplier Rule or the CBF). What the Court does conclude is that St. Paul's has not shown that it is substantially likely to succeed on its substantive due process cause of action. On its face, defendants' adoption of the CBF does not appear to satisfy the rigorous shock-the-conscience test, and the record does not appear substantially likely to support a finding that the AHSAA acted with "deliberate indifference to an extremely great risk of serious injury" in passing the rule.[37] Accordingly, St. Paul's is not entitled to a preliminary injunction on Count II.

---

[36] Specifically, St. Paul's voluntarily scheduled football games against one 7A opponent and one 6A opponent in each of 2017 and 2016, one 7A opponent in each of 2015 and 2014, and two 6A opponents in 2013. (Doc. 24, Exh. A-4.) From 2011-2017, St. Paul's football has a record of 8-3 against class 7A and 6A competition. (Doc. 24, Exh. A-21.)

[37] In arguing otherwise, plaintiff places great weight on the National Federation of State High School Associations' Report from the July 2014 NFHS Concussion Summit Task Force (doc. 1, Exh. I), as proof of deliberate indifference by the AHSAA. (*See* doc. 30, at 23.) The Court has reviewed the 2014 Concussion Summit Report, which enumerates nine "Fundamentals for Minimizing Head Impact Exposure and Concussion Risk in Football." None of those listed "Fundamentals" can plausibly be read as condemning the practice of high school football teams "playing up" against larger schools. While plaintiff is correct that the Report mentions as a risk factor "[t]wo-way players versus those who only play offense or defense," the Report in no way advocated for or proposed a prohibition of that type of matchup. Nor is there any indication that this is a substantial issue for St. Paul's. The incidence of two-way players on a team appears highly correlated to roster size, with smaller teams needing to play more student-athletes on both offense and defense. However, record evidence is that St. Paul's roster size of 75 is comparable to the average (73.85) in Class 6A. (Doc. 24, Exh. A-2, at 3.) Besides, large disparities in roster size between opponents in the same classification happen with or without implementation of the CBF. As a 5A football school in 2017-2018, St. Paul's fielded one of the largest teams at 75 student-athletes, compared to the average of 57.76. (*Id.* at 3-4.) Among St. Paul's 5A opponents in the 2017 season were Wilcox Central High School (roster size 49) and Williamson High School (roster size 31). (Doc. 24, Exh. A-2 & A-4.) By St. Paul's logic, the concussion risks its cites would be equal or even greater for the likes of Wilcox Central and Williamson playing St. Paul's last year (all in the same classification) as for St. Paul's playing (Continued)

### D.     Procedural Due Process Claim.

Count III of the Complaint alleges violations of procedural due process.  Relying on the same purported property rights identified in the context of Count II (substantive due process), St. Paul's pleads that defendants "depriv[ed] St. Paul's of its aforementioned constitutionally protected rights without due process, including notice and an opportunity to be heard at a meaningful time and in a meaningful manner, and by applying the CBF in an *ex post facto* manner."  (Doc. 1, ¶ 154.)

On its face, Count III appears in conflict with the facts.[38]  After all, Article XI of the AHSAA's Constitution sets forth an appeals process, and all indications are that process was properly followed in this case.  Undisputed record evidence confirms that St. Paul's contacted the AHSAA in January 2018 (two months after adoption of the CBF rule), requesting the opportunity to attend the next meeting of the Association's Central Board of Control to discuss the CBF.  Defendants accommodated this request and, on January 31, 2018, St. Paul's head of school and athletic director appeared before the Central Board and presented their concerns.  During that meeting, St. Paul's requested that the AHSAA vacate the CBF or suspend its

---

larger 6A opponents in 2018.  In short, concerns about roster size and the incidence of two-way players versus one-way players appear no different before the CBF as compared to after the CBF.  It's just that St. Paul's is changing status from one of the larger rosters in its former classification to a medium-size roster in its new classification.  None of this evinces deliberate indifference by the AHSAA to the risk of concussions.  For all of these reasons, this 2014 Concussion Summit Report on which plaintiff relies does not give rise to a substantial likelihood that the AHSAA, in adopting the CBF, will be found to have been deliberately indifferent to an extremely great risk of serious injury to private school student-athletes.

[38]     A preliminary issue, of course, is whether there has been a deprivation of a protected property right at all.  *See generally Bing Quan Lin v. U.S. Attorney General*, 881 F.3d 860, 868-69 (11th Cir. 2018) ("Procedural due process claims must assert a deprivation of a constitutionally protected liberty or property interest."); *Greenbriar Village, LLC v. Mountain Brook, City*, 345 F.3d 1258, 1265 (11th Cir. 2003) ("[N]o procedural due process claim exists until a sufficiently certain property right under state law is first shown."); *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994) ("[a] § 1983 action alleging a procedural due process clause violation requires proof of … a deprivation of a constitutionally protected liberty or property interest").  For the reasons set forth in Sections IV.C. and IV.E., the Court has substantial questions as to whether St. Paul's can prevail on the merits to show that the general statements in the AHSAA Constitution, Bylaws, and Handbook conferred upon St. Paul's protected property rights in anything, much less that the CBF effected a deprivation of those rights.

application pending further analysis. The Central Board declined to do so; however, the AHSAA invited St. Paul's to appeal. St. Paul's did so. On that basis, defendants set the matter for an AHSAA appeal hearing on March 13, 2018. St. Paul's attended that hearing, delivered a lengthy PowerPoint presentation, and offered multiple alternative proposals. The Central Board reviewed the information provided and engaged in considerable discussion, after which it voted unanimously to deny the appeal. Defendants notified St. Paul's of this decision on March 14, 2018. Given these clearly established record facts, St. Paul's position that it was somehow denied procedural due process with respect to the CBF rule does not enjoy a substantial likelihood of success.[39]

In its reply brief, St. Paul's clarifies that its objection is not to the amount or type of process received, but to its timing. Plaintiff cites authority for the proposition that constitutional deprivations generally must be preceded by notice and an opportunity to be heard, whereas in this case St. Paul's received no process prior to adoption of the CBF rule. (Doc. 30, at 22.) Unquestionably, there are cases that so state.[40] It is beyond cavil that "due process must not only be adequate; it must be timely." *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d

---

[39] The Complaint's offhand statement that procedural due process was violated because the CBF was applied "in an *ex post facto* manner" appears not to provide a legal foothold for finding a procedural due process violation here. *See, e.g., Waldman*, 871 F.3d at 1293 ("The *Ex Post Facto* Clause prohibits imposition of laws that punish acts that were not punishable when committed, or laws that increase the punishment for an act after that act has been done. … The *ex post facto* bar applies only to criminal laws, however, not to civil regulatory regimes.") (citations omitted); *Butler v. City of Jackson, State of TN*, 54 Fed.Appx. 815, 817 (6th Cir. Dec. 18, 2002) (recognizing that "*ex post facto* principles have no application in civil contexts" and that where "[t]he actions taken against Butler were entirely civil in nature, … the Ex Post Facto Clause is not implicated"); *McGuire v. Strange*, 83 F. Supp.3d 1231, 1245 (M.D. Ala. 2015) ("a civil regulatory regime is not subject to an *ex post facto* challenge"); *Centerfold Club, Inc. v. City of St. Petersburg*, 969 F. Supp. 1288, 1309 (M.D. Fla. 1997) (rejecting *ex post facto* challenge to zoning ordinance limiting locations of adult entertainment establishments, inasmuch as such ordinance "does not legislatively determine the guilt or innocence of a person and/or inflict punishment"). Plaintiff has not argued otherwise.

[40] *See, e.g., Gissendaner v. Commissioner, Georgia Dep't of Corrections*, 794 F.3d 1327, 1331 n.5 (11th Cir. 2015) ("As a general rule, the two basic requirements of the Due Process Clause are notice and an opportunity to be heard prior to the deprivation of life, liberty, or property."); *Vinyard*, 311 F.3d at 1356 ("Procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest.").

713, 728 (11th Cir. 2014). Nonetheless, a more precise formulation of the rule is that "[p]rocedural due process requires only an opportunity to be heard at a meaningful time and in a meaningful manner." *Bush v. Secretary, Florida Dep't of Corrections*, 888 F.3d 1188, 1196 (11th Cir. 2018) (citations omitted).[41] After all, it is black-letter law that, contrary to the rigid bright-line rule championed by St. Paul's, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citation omitted); *see also Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009) ("due process is a flexible concept that varies with the particular circumstances of each case") (citation omitted); *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) ("[t]he Supreme Court has often noted that due process is a flexible concept that varies with the particular circumstances of each case").

Given this flexibility and the primacy of "meaningful time" and "meaningful manner" principles, the Court does not adopt plaintiff's argument that failure to provide notice and an opportunity to be heard before the AHSAA adopted the CBF rule amounts to a *per se* violation of procedural due process. Rather, case law teaches that "[t]he need for some form of predeprivation hearing is determined from balancing the competing interests at stake." *Bailey v. Board of County Com'rs of Alachua County, Fla.*, 956 F.2d 1112, 1123 n.12 (11th Cir. 1992). "[T]he specific dictates of due process in any given case are determined by considering: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Reams*, 561 F.3d at 1263-64 (citation and internal quotation marks omitted); *see also Stansell*, 771 F.3d at 728 (similar).

Viewed through the lens of these principles, the record facts do not show that St. Paul's has a substantial likelihood of success on its procedural due process claim. The AHSAA adopted

---

[41]     *See also Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) ("The government must provide the required notice and opportunity for hearing at a meaningful time and in a meaningful manner ....") (citation omitted).

the CBF in November 2017; however, this rule was not set to go into effect until the 2018-2019 school year. By all appearances, adoption of the CBF changed nothing for St. Paul's in the short term. All of its teams remained classified as 5A for the remainder of the 2017-2018 academic year, spanning six months after the CBF's adoption. St. Paul's received notice of the rule and availed itself of an opportunity to be heard in January 2018, followed by an appeal in March 2018. It appears that these hearings were furnished to St. Paul's at a meaningful time and that St. Paul's was afforded a full, fair opportunity to be heard in a meaningful manner. Had St. Paul's succeeded in persuading the Central Board to jettison or suspend the CBF rule in January or March 2018, then St. Paul's would not have sustained any ill effects whatsoever from the CBF. It would never have had to play a single football game (or compete in any other sport) in the 6A classification. The challenged rule simply would never have affected, much less injured, St. Paul's. Given that the process afforded to St. Paul's was thus adequate (from a timing standpoint) to forestall any harm arising from the November 2017 adoption of the CBF in the event of a favorable hearing result, there does not appear to be a persuasive argument that St. Paul's was deprived of an opportunity to be heard at a meaningful time (*i.e.*, that the process provided to St. Paul's was untimely in some way).

For the foregoing reasons, the Court is of the opinion that St. Paul's has failed to show a substantial likelihood of success on the procedural due process claim found at Count III of the Complaint. No preliminary injunction is appropriate on that theory.

### E. State-Law Declaratory Judgment Claim.

Finally, in Count IV of the Complaint, St. Paul's brings a state-law claim pursuant to the Alabama Declaratory Judgment Act, Ala. Code §§ 6-6-220 *et seq.* The Complaint alleges that the AHSAA is obligated by its Constitution, Bylaws and Handbook to perform certain duties and to refrain from certain activities, to-wit: (i) "To treat all general classes of its member schools (*i.e.*, public and private) equally;" (ii) "To not disadvantage, harm, or otherwise injure the athletic programs of one class of schools (*i.e.*, public or private) to the benefit of another class of schools;" (iii) "To adopt and apply rules that improve and enhance the safety of athletic programs for student-athletes from all member schools;" and (iv) "To refrain from adopting or applying rules (or engaging in other acts) that substantially increase the risk of personal injury and harm to student-athletes." (Doc. 1, ¶ 160.) On that basis, St. Paul's requests that this Court

declare the parties' respective rights and duties relative the AHSAA's Constitution, Bylaws and Handbook.

In order for Count IV to support granting the Motion for Preliminary Injunction, St. Paul's must show a substantial likelihood that the CBF violates the AHSAA's obligations and duties under the subject documents. It has not met this burden. For example, while plaintiff contends that the AHSAA somehow had a duty not to adopt rules that treat private-school members any differently than public-school members, the Constitution, Bylaws and Handbook evince no such promises, assurances or explicit understandings. St. Paul's points to language in the Handbook that the AHSAA's purpose is to "regulate, coordinate and promote the interscholastic athletic programs among its member schools, which include public, private and parochial institutions;" that the AHSAA's major aims are "to serve the needs of its member schools in conducting their interscholastic athletic programs;" that the AHSAA "is concerned primarily with benefits to all the participants and to spreading those benefits to constantly increasing numbers;" and that the AHSAA's object "shall be to promote pure athletic competition in the high schools of Alabama." (Doc. 17, Exh. 4, at 16, 94, 96; doc. 30, at 19.) On this record, it does not appear substantially likely that any of these broad, generic statements are sufficiently definite to confer property rights on St. Paul's or to furnish contractual guarantees of any particular form of treatment by the Association. It is far from clear how any of these statements may be reasonably read as forbidding AHSAA from classifying private-school members differently than public-school members in the interest of promoting competitive balance.[42]

_____

[42] To the contrary, where one group of members has identifiable advantages in competition and a track record of consistently winning disproportionate championships, the contractual language cited by St. Paul's would appear to support a reasonable construction that it actually authorizes the AHSAA to implement measures such as the CBF in the interests of regulating, coordinating and promoting member schools' athletic programs; serving member schools' needs; obtaining benefits for all participants; and promoting "pure athletic competition." If private schools are perceived to be dominating public schools in interscholastic athletic competition because of certain inherent advantages, then the very Handbook language on which St. Paul's relies would appear reasonably capable of justifying the action taken by the AHSAA in the interest of restoring competitive balance, which logically stands to benefit all members. Would it not serve the interest of "pure athletic competition" to adopt measures aimed at offsetting perceived advantages enjoyed by a subset of the Association's members in order to facilitate a level playing field? Certainly, plaintiff has not shown a substantial likelihood that the (Continued)

Furthermore, Article VII(*l*) of the AHSAA Constitution expressly confers upon the Central Board the unfettered "power to classify member schools into two or more divisions for the purpose of athletic competition." (Doc. 17, Exh. 4, at 20.) Nothing in that language would restrict the Central Board from relying on distinguishing features or criteria other than enrollment in exercising such power. Likewise, nothing in that language would appear to bar the AHSAA from taking into consideration the outsized success of one subset of its members (*i.e.*, private schools) in exercising its classification power, particularly where that outsized success is rationally perceived to be rooted in certain advantages accruing to that subset of member schools.

In its briefs, St. Paul's relies on Article VII(i) of the AHSAA Constitution, which provides that the Central Board "shall have full authority to adopt rules and regulations which shall be uniformly effective and binding upon all members of the Association." (Doc. 17, Exh. 4, at 19.) Plaintiff posits that the "uniformly effective" and "binding upon all members" language prohibits any rules that apply only to certain subsets of the membership. But plaintiff places more weight on this provision that it appears reasonably capable of bearing. After all, Article VII(i) is not framed as a limiting statement or restriction forbidding the Central Board from imposing rules and regulations that apply to some (but not all) members; indeed, that subsection is simply one item in a long list delineating the Central Board's extensive powers and broad authority. Among the powers conferred on the Central Board by Article VII are "the power to classify member schools" and "authority over any matter related to championship play," without any identified limits or boundaries. (*Id.* at 20.) Viewed in context, then, Article VII(i) does not seem substantially likely to support a construction that the AHSAA's Central Board was not empowered to adopt any rule that does not apply equally to <u>all</u> members.

On the topic of safety, St. Paul's says the Constitution, Bylaws and Handbook obligated the AHSAA "[t]o adopt and apply rules that improve and enhance the safety of athletic programs for student athletes from all member schools." (Doc. 1, ¶ 160(c).) Assuming that the AHSAA undertook such a contractual obligation, the court record reflects that the AHSAA adopted

_____

quoted Handbook language is properly construed as forbidding the AHSAA from undertaking such remedial activities.

numerous rules in fulfillment of that commitment, such as fall football practice regulations, intravenous fluid use policy, and concussion policy, among others. (Doc. 17, Exh. 4, at 48-55.) On this record, it is unclear how plaintiff could reasonably suggest that St. Paul's has failed to adopt health and safety rules.

St. Paul's also asserts that the AHSAA was under a contractual obligation to "refrain from adopting or applying rules (or engaging in other acts) that substantially increase the risk of personal injury and harm to student-athletes." (Doc. 1, ¶ 160(d).) There does not appear to be a particular provision in the AHSAA's Constitution, Bylaws or Handbook that explicitly imposes such a duty on the AHSAA; however, it is not unreasonable to suggest that such an obligation is implicit given the AHSAA's role and purpose in regulating interscholastic athletic competition among its members. The problem is that the record before this Court does not reveal a substantial likelihood that St. Paul's will prevail on its theory that adoption of the CBF "substantially increase[d] the risk of personal injury and harm to student-athletes." The facts and circumstances discussed in Section IV.C., *supra*, in the context of St. Paul's "deliberate indifference" claim likewise show that St. Paul's is not likely to succeed on a theory that the AHSAA shirked its duty to avoid adopting rules that substantially increase the risk of injury to private-school student-athletes.

Further militating against entry of a preliminary injunction as to Count IV is the line of Alabama authorities supporting the proposition that courts generally should not interfere with the internal operations of the AHSAA. The Alabama Supreme Court has explained, in the context of a legal challenge to the AHSAA's determination that the plaintiff was ineligible to play high-school football, that "[a]thletics and athletes belong in their own arena. A courtroom is not the proper field of competition." *Alabama High School Athletic Ass'n v. Rose*, 446 So.2d 1, 5 (Ala. 1984). Subscribing to a "hands-off philosophy" summarized by the mantra "it's their show; let them run it," the *Rose* Court elaborated that "[e]ven claimed violations of due process of law are viewed more liberally in favor of the association's authority to administer its own rules and regulations." *Id.*[43] Last year, the Alabama Supreme Court reaffirmed the proposition that "the

---

[43] This *laissez-faire* approach to judicial oversight of the AHSAA's activities is perhaps best encapsulated by the following statement by the Alabama Supreme Court: "If officials of a school desire to associate with other schools and prescribe conditions of eligibility for students who are to become members of the school's athletic teams, and the member schools (Continued)

burden on the challenger to overcome the presumption favoring the Association's absolute authority in the conduct of its own affairs is a heavy one," requiring clear and convincing evidence of fraud, collusion or arbitrariness. *Ex parte Alabama High School Athletic Association*, 229 So.3d 1100, 1102 (Ala. 2017) (citation omitted). As discussed *supra*, St. Paul's has not made a sufficient showing of arbitrariness to be entitled to preliminary injunctive relief. There is no evidence of fraud or collusion. Under these circumstances, and given the clear Alabama precedents on the subject, the Court finds that St. Paul's has failed to make a substantial showing that it will succeed on its state-law declaratory judgment claim, not only because of the dearth of concrete obligations or promises found in the subject documents but also because Alabama courts are highly respectful of, and deferential to, the AHSAA's absolute authority to conduct its own affairs. The Court does not believe that Alabama courts would grant plaintiff preliminary injunctive relief on Count IV on this showing; therefore, this Court applying Alabama law will not do so either.

In sum, Count IV suffers from numerous deficiencies that, taken collectively, preclude the entry of preliminary injunctive relief in plaintiff's favor. Plaintiff seeks to derive ironclad (albeit ill-defined and vague) contractual commitments from benign (and often aspirational) generalizations in the AHSAA's Constitution, Bylaws, and Handbook.[44] The CBF rule appears consistent with many of the provisions identified by St. Paul's as having purportedly been violated. The contention that the AHSAA adopted the CBF rule in disregard of safety considerations appears factually unsupported. There is no substantial likelihood that the AHSAA will be found to have violated any particular promise or assurance in adopting the CBF. And St. Paul's reliance on the Alabama Declaratory Judgment Act to request judicial intervention in the internal operations of the AHSAA, and to strike down the AHSAA's near-absolute authority in conducting its own affairs, is at odds with substantial Alabama precedent

---

vest final enforcement of the association's rules in boards of control, then a court should not interfere in such internal operation of the affairs of the association" in the absence of fraud, lack of jurisdiction, collusion or arbitrariness. *Scott v. Kilpatrick*, 237 So.2d 652, 655 (Ala. 1970).

[44]     *See* doc. 30, at 20 ("St. Paul's rights boil down to fair dealings, equal treatment, and safe and 'uniform' rule-making.").

where, as here, the record does not appear likely to support a finding of fraud, collusion or arbitrariness.

## V.    Conclusion.

For all of the foregoing reasons, plaintiff's Motion for Preliminary Injunction (doc. 2) is **denied**.  The Court will enter a briefing schedule on defendants' Motion to Dismiss (doc. 32) forthwith.

DONE and ORDERED this 27th day of June, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE